UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES,**<br><br>v.<br><br>**DANIEL FRISIELLO,**<br>Defendant | Crim. No. 18-CR-10314-NMG |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States recommends that Mr. Frisiello be sentenced to 36 months of incarceration followed by 36 months of supervised release under strict conditions, restitution, a $1,900 special assessment, and no fine because he appears unable to pay a fine even on a reasonable installment plan. The United States recommends this below-guidelines sentence because of the unique circumstances concerning Mr. Frisiello's mental and emotional conditions and how they will likely intensify his time in prison. Were it not for those characteristics, the United States would recommend incarceration at the top of the guidelines range.

**I.   FACTS**

From 2015 through 2018, Mr. Frisiello sent thirteen letters that threatened death, one that threatened rape. Six included white powder. Most went to people engaged in public service and were motivated because of that service. His victims were:

2015

- A Massachusetts company, which Mr. Frisiello threatened because it had terminated one of his relatives, PSR ¶¶ 14-15;

2016

- Then-presidential candidate Donald Trump's son and daughter-in-law, whom Mr. Frisiello threatened with white powder in a bid to persuade the candidate to drop out of the presidential race, PSR ¶ 16;

- The chiefs and former chiefs of the Middletown (Conn.) Police Department, the Windsor (Conn.) Police Department, and the South Kingstown (RI) Police Department, and the former colonel of the Connecticut State Police, all of whom Mr. Frisiello threatened with death because he wanted them to stop investigating Nathan Carman for murder, PSR ¶¶ 22-27;

2017

- A former Bristol County (Mass.) assistant district attorney and Massachusetts state judge, whom Mr. Frisiello threatened with death because he wanted them to drop the involuntary manslaughter prosecution of Michelle Carter, PSR ¶¶ 28-29;

2018

- The son of President Trump, whom Mr. Frisiello threatened with white powder because of the victim's connection with his father, PSR ¶ 31;

- The then-Interim United States Attorney for the Central District of California, whom Mr. Frisiello threatened with white powder because he objected to the office's conviction of an actor for possessing child pornography, PSR ¶ 31;

- A Stanford law professor, whom Mr. Frisiello threatened with white powder and rape because he objected to the professor's campaign to recall a state judge for sentencing a college athlete to only six months' confinement for sexual assault, PSR ¶¶ 33-35;

- A United States Senator, whom Mr. Frisiello threatened with white powder because he disagreed with the Senator's public comments that disparaged a doctor convicted of criminal sexual conduct against competitive gymnasts who were minors, and supported the father of three of those victims, PSR ¶ 37; and

- A candidate for the United State House of Representatives, whom Mr. Frisiello threatened with white powder because he disagreed with the candidate's political views, PSR ¶ 39.

White powder is a potent threat. Victims and investigators must worry whether the white powder is anthrax, an extremely deadly disease, or some other disease, poison, or contaminant. *See* PSR ¶¶ 17-19. Inert powder does not negate the need for investigation or mitigation, because investigators cannot know whether it is inert at the start. PSR ¶ 40. Consequently, the white-powder letters required hazardous materials responses and investigations, which require

specialized personnel, equipment, time, and money, and sometimes require evacuating the recipient's building, isolating or quarantining people in the area, seeking medical attention, and taking prophylactic antibiotics. PSR ¶¶ 17-20, 31, 32, 33, 37, 39. Mr. Frisiello had researched earlier anthrax scares and knew that people would take them seriously and be afraid of them. PSR ¶ 42.

Despite Mr. Frisiello's mental and emotional conditions, he understood and intended that his victims would be scared. PSR ¶ 40. He wanted this, he admitted, because he has very strong beliefs and disagreed with his targets' beliefs or actions. PSR ¶ 41. After his targets (or people generally) ignored his earlier non-threatening communications, Mr. Frisiello figured that they would listen only to a threat. *Id.* He also wanted them to feel the anger that he felt. *Id.*

Consequently, the language Mr. Frisiello used was demeaning, profane, and in one case anti-Semitic. PSR ¶ 40. In fact, his threats were often carefully targeted to the victim and the cause of Mr. Frisiello's dissatisfaction. For example, two of the letters to law enforcement officers warned them that they would end up at the bottom of the sea if they continued investigating Nathan Carman for murder, PSR ¶¶ 24, 26, which was particular piercing given that Carman was suspected of sinking his boat in the ocean in order to drown his mother, PSR ¶ 22. In another example, the letter to the law professor threatened to treat her the same as the professor's client, the woman who had been sexually assaulted. PSR ¶ 33. In yet another example, the letter to the assistant district attorney warning her and the judge to drop the Michelle Carter prosecution, noting that because the trial would be jury-waived, he needed only two bullets (for the prosecutor and the judge) rather than twelve (for the jury). *See* PSR ¶¶ 28-29. In other words, Mr. Frisiello crafted his threats for maximum impact.

Despite Mr. Frisiello's mental and emotional conditions, he knew that his conduct was

3

wrong and therefore considered carefully how to commit his crimes and how to avoid capture. As mentioned above, he researched prior anthrax scares. PSR ¶ 42. He knew from his parents not to use strong language when communicating with others. PSR ¶ 44. He purposefully concealed his identity by sending non-threatening letters using his correct name and/or return address but sending threatening letters without his name or return address. PSR ¶ 46. He avoided authorities tracing him to a specific mailbox by using different mailboxes in different cities. PSR ¶ 46. He understood that he could avoid capture by depositing his letters in general-collection mailboxes (and thus receive a Boston postmark) rather than at his hometown post office (which would thus receive a Beverly postmark). PSR ¶¶ 48-49. He chose some victims or victims' addresses because he understood that they might be easier to target than other victims or addresses. PSR ¶¶ 46-47. And he deliberated about whether a letter to a United States Senator might be more serious than one to the First Family, and thus in 2018 held on to the Senator's letter a while longer before mailing it than he held onto the First Family's letter. PSR ¶ 45.

Finally, Mr. Frisiello would have continued committing crimes had he not been arrested. He sent threatening letters in 2015, 2016, 2017, and 2018. He eluded detection for years. He maintained a grudge list of people who he resented, along with details about where they worked or lived and what they had done. PSR ¶ 11. At least two victims in this case came from this grudge list. PSR ¶ 11. More crimes were likely.

## II. SENTENCING GUIDELINES

Although the parties and Probation agree on the applicable sentencing guidelines,[1] the

---

[1] The United States agrees that the guideline calculations in the PSR are more accurate than those in the plea agreement.

guidelines merit a brief discussion to note that they reflect Mr. Frisiello's culpability in qualitative terms.

They do measure culpability appropriately. The calculations are largely governed by USSG § 2A6.1. The base level of 12, USSG § 2A6.1(a)(1), is large and reflects culpability by recognizing that threats make victims fear for their person and property, disrupt their lives, and require law enforcement officers to investigate and mitigate the threats. The guideline further reflects culpability by punishing Mr. Frisiello more severely for more-severe consequences, with an upward adjustment for the white-powder letters' substantial disruption of public, governmental or business functions, and/or a substantial expenditure of clean-up funds. *See* USSG § 2A6.1(b)(4); PSR ¶ 59. The guidelines further reflect culpability by punishing Mr. Frisiello more severely for targeting certain government officers and their family members. *See* USSG § 3A1.2(b); PSR ¶ 60. The guidelines finally reflect culpability by imposing an upward adjustment to reflect a harsher punishment for threatening multiple victims. *See* USSG § 3D1.4; PSR ¶ 64. Moreover, the guidelines appropriately do not reward Mr. Frisiello with a downward adjustment, reflecting lesser culpability, for making a single threat made with "little or no deliberation," USSG § 2A6.1(b)(6), because all the circumstance indicated that Mr. Frisiello acted repeatedly and with deliberation.

The guideline calculations therefore reflect Mr. Frisiello's culpability for his threats.

**III. NATURE AND CIRCUMSTANCES OF THE OFFENSES – 18 U.S.C. § 3553(A)(1)**

The nature and circumstances of Mr. Frisiello's offenses deserve a significant sentence. He committed multiple crimes over a four-year span. Although Mr. Frisiello's various experts suggest that his limitations prevented him from understanding fully what he was doing or the

consequences to his victims or himself, the facts recounted above demonstrate that Mr. Frisiello committed these crimes them with planning, purpose, and the intent to avoid capture.

## IV.  SERIOUSNESS OF THE OFFENSES – 18 U.S.C. § 3553(A)(2)(A)

Threats are serious.  A threat is a crime of violence.  *See* 18 U.S.C. § 16(a) ("The term 'crime of violence' means — (a) an offense that has as an element the . . . threatened use of physical force against the person or property of another . . .").  A threat is not just a physical injury that never came to be.  Rather, a threat is an instrument to cause the victim fear.  Fear is the primary injury — especially when white powder prompts fear of long-term infection and the need for immediate medical attention.  A secondary injury is the diversion of law enforcement and other first responders to evaluate whether the threat will turn into physical injury — again, especially when white powder prompts a full-scale, expensive and time-consuming hazardous materials investigation.  So any threat is a serious offense.

Mr. Frisiello's threats count among the most serious prosecuted in this district.  He sent six white-powder letters and nine more letters that threatened death or rape.  He interfered with a presidential election, a Congressional election, three criminal investigations or prosecutions, and a judicial recall campaign.  However you measure it, Frisiello's crimes were significant in both context, number, and scope.

## V.  PROMOTING RESPECT FOR THE LAW AND PROVIDING JUST PUNISHMENT – 18 U.S.C. § 3553(A)(2)(A)

In the face of such serious offenses, the need for a sentence that promotes respect for the law need not be belabored.  An insubstantial sentence would convey that the law does not matter.

Such serious crimes also deserve a substantial sentence to achieve just punishment, that is, blame and some retribution.  Retribution is appropriate because Mr. Frisiello harmed multiple

victims' dignity, well-being, and sense of safety. At least one recipient went to the hospital. PSR ¶ 31. In a letter to the Court, another recipient said that Mr. Frisiello caused the recipient so much fear that the recipient still experiences severe panic attacks, great difficulty sleeping, a fear of standing near windows, and great fear when the recipient's child does not immediately return calls or texts. Retribution is also appropriate because Mr. Frisiello diverted significant law enforcement resources to investigate the threatening letters and to mitigate the white-powder risks. These resources are expensive, time-consuming, invasive, can cause major logistical problems — especially in New York City, the location of the first white-powder letter — and prevent law enforcement from focusing on other crimes.

Just punishment also requires an assessment of blame.[2] There are four "functions of punishment-as-expression-of-blame . . . : it can promote authoritative disavowal of the offense, symbolic nonacquiescence in the offense, vindication or reaffirmation of the law, and absolution of others who might have been suspected of the offense."[3] Blaming occurs when "some person or group of persons . . . feel the attitudes of resentment and indignation . . . and express their

---

[2] *See* Carol S. Steiker, *Punishment and Procedure: Punishment Theory and the Criminal-Civil Procedural Divide*, 85 Geo. L.J. 775, 803 (Apr. 1997) (summarizing views on what "distinguishes mere penalties or price-tags from true punishments: punishment expresses attitudes of resentment and indignation and judgments of disapproval and reprobation on the part of the punishing authority himself or of those in whose name the punishment is inflicted," such that "[i]n short, punishment expresses blame, and it is through this expression that we recognize certain actions as punishment") (citation, footnotes, and internal quotation marks omitted).

[3] *Id.* at 804 (citing prior work).

judgments of disapproval and reprobation through the act of punishing."[4]  "[B]laming [also] occurs . . . when it is made clear to a *wrongdoer* that his or her behavior falls into the category of that which is the proper subject of collective condemnation."[5]  Finally, punishment-as-blaming "communicates not only with the wrongdoer, but with the victim and the particular community affected by the act of wrongdoing (as distinct from the community that designated the category of behavior as deserving of condemnation in the first place)."[6]

Mr. Frisiello's threats especially deserve blame because he largely targeted public figures or their family for participating in the political process or in law enforcement.  In many cases he did so to thwart or punish criminal investigations into child pornography, involuntary manslaughter, and murder.  The Court should play an important societal function by placing blame where it lies.

## VI.  ADEQUATE DETERRENCE TO CRIMINAL CONDUCT – 18 U.S.C. § 3553(A)(2)(B)

While there is considerable debate about the extent to which a criminal sentence achieves general deterrence, general deterrence has the best chance here because this case has received considerable public attention.  And the public continues to be interested in the steady stream of threats that have become part of the public discourse.  A significant sentence that reaffirms that such discourse is prohibited could readjust those public norms.

---

[4] *Id.* at 805 (internal quotation marks and footnote omitted).

[5] *Id.* (emphasis in original; internal quotation marks and footnote omitted).

[6] *Id.*

8

## VII. PROTECTING THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT – 18 U.S.C. § 3553(A)(2)(C)

A significant sentence would also protect the public from further crimes by Mr. Frisiello. He is at risk of re-offending. He kept a grudge list. He sent numerous threatening letters over a four-year period. He did so because others did not agree with him. These frustrations are unlikely to abate after the criminal process ends: there will always be someone who disagrees with him about something.

Mr. Frisiello is at risk of re-offending even though he has not reoffended in the year since his arrest. He has not re-offended because he had no chance to do so: the strict conditions of release cut off his access to the mail. This is why imprisonment and a 36-month term of supervised release are both warranted.

## VIII. THE DEFENDANT'S HISTORY AND CHARACTERISTICS – 18 U.S.C. § 3553(A)(1)

Under any other circumstances, the United States would recommend a sentence at the top of the guidelines. But Mr. Frisiello's mental and emotional limitations suggest that a lower sentence is appropriate. He suffered from oxygen deprivation during birth, which led to significant developmental delays, autism, and a borderline IQ that have affected him throughout his life. This was all diagnosed and treated before the current offense; they are not an after-the-fact contrivance.

To be clear: Mr. Frisiello's limitations did not prevent him from having the requisite *mens rea* to commit the offenses of conviction. He understood that his actions were wrong and took actions to avoid detection. He understands concepts like the law and morality. He can regulate his own behavior. He went to school, earned a high school degree, and a community college certificate. PSR ¶¶ 111-112. Granted, there is some documentation from the defense —

9

documentation that has some basis in fact — that Mr. Frisiello's conditions limited his ability to control his impulses and his understanding of the likely effects and import of his actions. Nevertheless these documented limitations overstate Mr. Frisiello's helplessness, given the actions Mr. Frisiello took to plan his crimes and avoid detection.

As well: the government believes that the Bureau of Prison can appropriately imprison, care for, and treat Mr. Frisiello. BOP has experience with many inmates with varying limitations. The Administrator of BOP's Psychology Services Branch has reviewed Mr. Frisiello's records and concluded that BOP can accommodate Mr. Frisiello's conditions, medications, and psychological needs. BOP even has a program formulated to help inmates with intellectual disabilities and social skill impairments like Mr. Frisiello's. The Court should discount the concerns of Mr. Frisiello's experts to the contrary. First, BOP has the primary experience, not outside experts. Second, Mr. Frisiello's experts' main contention — that BOP will not offer the same gold standard of treatment that Mr. Frisiello has received at home —is suspect and not entirely relevant. To begin with, under his caregivers' treatment Mr. Frisiello committed numerous crimes. Moreover, Mr. Frisiello is entitled to an appropriate treatment, not the gold standard. BOP can imprison, care for, and treat Mr. Frisiello adequately.

That all being said, the government does credit one aspect of the defense experts' reports: that Mr. Frisiello's conditions and limitations will cause him to experience prison more intensively and acutely than other inmates. For those reasons, the government recommends a variance[7] down to 36 months' imprisonment.

---

[7] This should be a variance rather than a downward departure. The diminished capacity

## IX. PROVIDING THE DEFENDANT WITH NEEDED EDUCATIONAL OR VOCATIONAL TRAINING, MEDICAL CARE, OR OTHER CORRECTIONAL TREATMENT IN THE MOST EFFECTIVE MANNER – 18 U.S.C. § 3553(A)(2)(D)

It is unclear the extent to which the concerns raised by 18 U.S.C. § 3553(a)(2)(D) are still to be considered at sentencing. *See* 18 U.S.C. § 3582(a) (requiring sentencing court to consider § 3553(a) factors while "recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation"); *Tapia v. United States*, 564 U.S. 319, 332 (2011) ("Section 3582(a) precludes sentencing courts from imposing or lengthening a prison term to promote an offender's rehabilitation."). To the extent that they are, they are addressed in the prior and following subsections of this memorandum.

## X. PARSIMONY PRINCIPLE – 18 U.S.C. § 3553(A)

Probation is inappropriate because it would essentially be a continuation of Mr. Frisiello's prior life before conviction, which was mostly staying at home. And a sentence below 36 months of imprisonment would seriously understate the seriousness of Mr. Frisiello's offenses, the effect he had on victims, the risk of reoffending, and the need for specific and individual deterrence, just punishment, and respect for the law.

---

guideline does not apply here because "the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence." USSG § 5K2.13. *See United States v. Gorsuch,* 404 F.3d 543, 547-48 (1st Cir. 2005) (favoring, without deciding, guideline interpretation that precludes diminished capacity downward departure if the "facts and circumstances of the offense per se indicate a need to protect the public because the offense per se involved actual violence or a serious threat of violence," rather than interpretation that precludes downward departure only on independent evidence of an ongoing need to protect the public).

## CONCLUSION

For all these reasons, the Court should impose a sentence of 36 months of incarceration followed by 36 months of supervised release under strict conditions, restitution, and a $1,900 special assessment.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By: */s/ Scott L. Garland*
Scott L. Garland
Assistant U.S. Attorney

Date: April 17, 2019

## CERTIFICATE OF SERVICE

I hereby certify that this document is being filed through the ECF system and therefore will be sent electronically to the registered participants identified on the Notice of Electronic Filing.

*/s/ Scott L. Garland*
Scott L. Garland
Assistant U.S. Attorney

Date: April 17, 2019