IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DANIEL FRISIELLO | No. 18-cr-10314-NMG |

## **DEFENDANT'S SENTENCING MEMORANDUM**

Daniel Frisiello committed serious crimes when he sent threatening letters, sometimes containing a hoax white powder, to various public officials and others over the course of several years. He was aware that sending threats was wrong and therefore is legally responsible for his actions and subject to appropriate punishment.

But there also is no dispute that Daniel suffered anoxic brain damage at birth and is profoundly autistic, with a host of attendant symptoms and disabilities that impair his cognition, judgment, use of language, and ability to function in the world. These undisputed facts do not excuse Daniel's criminal conduct but they supply vital context to understand the genesis of his crimes and to gauge the degree of his moral culpability. These undisputed facts also mean that Daniel is uniquely ill-equipped to endure incarceration. A prison environment would inflict acute psychological distress and long-term damage. Daniel also would be susceptible to exploitation, violence, and isolation.

Against that backdrop, and as explained in greater detail below with support in the accompanying exhibits, we propose a sentence of **five years probation**, with the **first year in continued electronically monitored home confinement**, plus restitution and community service. This proposed sentence should <u>not</u> be viewed as a plea for leniency. Rather, it is entirely appropriate given Daniel's history and characteristics viewed together with the nature

- 1-

and circumstances of his offenses:  a penalty <u>sufficient</u>, <u>but not greater than necessary</u>, to balance and achieve <u>all</u> of the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

In addition to this memorandum, we have submitted the following materials separately to assist the Court:

> Sealed Exhibit I (psychological, medical, and other expert materials) (submitted separately under seal);
>
> Exhibit II (7-minute DVD video) (submitted separately);
>
> Exhibit III (letters from Daniel's parents, other family, friends, and broader community) (filed on ECF);
>
> Exhibit IV (allocution letter from Daniel Frisiello) (filed on ECF).

While this memorandum will reference and quote some of these materials, it is not intended to fully capture or even summarize their contents, which together with the PSR, are critical to a full understanding of Daniel, his background, and the offenses of conviction as the Court considers an appropriate sentence.

## **Background**

Daniel Frisiello is now 25 years old.  He suffered "anoxic brain injury at birth that has had far-reaching consequences for his growth and development."  Ex. I.A. (forensic psychiatric evaluation by Dr. Julia Reade) at 3.  "He has required an array of special services, treatment, and accommodations throughout his childhood and young adulthood in order to function in school and at work."  *Id*.

"Daniel was enrolled in an early intervention program as a toddler, as well as speech, occupational, and physical therapies to address his assortment of motoric problems and developmental and cognitive delays."  *Id*.  "He had IEPs, special classes, and myriad academic, emotional, and behavior accommodations throughout his schooling."  *Id*.

Daniel was diagnosed with Pervasive Developmental Disorder and then Autism Spectrum Disorder in early childhood. He also has a history of severe anxiety symptoms as well as occasional depressed mood, poor frustration tolerance, and difficulty modulating his emotions. These issues have been addressed over the years with a very thoughtfully developed and carefully maintained regimen of psychotropic medications, as well as individual psychotherapy.

Daniel has resided in his parents' Beverly, MA home for his entire life. While he struggled to form peer friendships, he has enjoyed interaction with and support of a very large extended family and his family's broader social community.

Daniel earned a high school diploma in 2013 from a specialized school called Learning Prep in Newton. He then attended North Shore Community College, earning a "certificate" in "legal office support." He received extensive support and accommodation and required two years rather than the typical one year to complete that program.

After he finished community college classes, Daniel had difficulty finding a job for nearly two years. In 2017, he secured a job as an assistant at Catholic Charities in Peabody, working 30 hours per week. He was terminated shortly after his arrest.

In order to address his social isolation, Daniel was encouraged over the years to engage with the world by corresponding with celebrities and public figures. In retrospect, it is also clear that Daniel spent far too much time immersing himself in current events and heated disputes on the Internet. A very large amount of benign correspondence — postcards, autographs, etc. — was found at his residence when he was arrested. Unfortunately, nobody in Daniel's support network realized that some of his correspondence had taken a darker turn. Dr. Reade explained:

> No longer in a structured setting, like school, where he had daily access to counselors, and not meeting frequently enough with his therapist to have a readily available sounding board, Daniel was more isolated and less supported. Because he seemed, on the surface, to be functioning well, his parents allowed him more

independence. It was in this setting that Daniel began to send angry letters to public officials and concealed his actions.

It seems clear that the alleged crimes are connected integrally to Daniel's sensitivity at being marginalized by his disabilities, his wish to effect change, and his belief that no one was listening to him. Although aspects of the alleged crime look sophisticated, Daniel's approach and aim were quite naïve, in my view, and in keeping with his neurocognitive limitations. He was angry about an assortment of issues, some that he had a garbled understanding of. He wanted attention and respect. And he wanted to change peoples' behavior and thinking. Daniel acknowledged to me that the white powder was intended to scare people, but he had no understanding regarding the consequences of his actions. He thought it was easy to tell the difference between "real" anthrax and the powder he sent.

The tragedy in this case is that Daniel's letter-writing, which began as a benign activity, was an important outlet for his self-expression, and allowed this socially anxious, cognitively limited, and deeply isolated young man a meaningful connection to the world. His correspondence with movie stars and the royal family was supported by his family and therapist because it seemed like an adaptive way for Daniel to communicate with a wider circle and to derive a sense of efficacy and self-respect. As his father told me, he and Daniel's mother had begun to relax their vigilance over Daniel because he seemed to be doing better on many different fronts and seemed to merit additional freedom. In retrospect, it is clear to everyone that Daniel's anger and frustration about his disabilities and sense of marginalization was deeper and more intense than they realized. His problematic letter writing—an outlet for that anger and frustration--went undetected until his arrest.

Ex. I.A. (Dr. Reade evaluation) at 29-30. Dr. Inz described the genesis of Daniel's crimes similarly:

Daniel's arrest in early 2018 caught everyone by surprise. Daniel had long been encouraged to engage with the world and to voice his opinion on topics, particularly on matters of personal freedom. He never hesitated to write to public figures and tell them what he thought. However, he never heard back. And in retrospect, Daniel also clearly felt that those around him – his family and service providers including myself – weren't really listening or taking him seriously. It was a blind spot for us. And unfortunately, Daniel acted out his frustration in a way that was immature, impulsive, and illegal. Perhaps as a function on the increased aggressive rhetoric of our current climate, especially on the internet and social media, Daniel exhibited a tone and message completely uncharacteristic of his generally placid demeanor.

I believe that Daniel wrote letters to people whom he felt were being unfair to others and that, while misguided, thought he was "standing up for those unable to

stand up for themselves" and trying to correct perceived "wrongs" that he saw and felt. While he clearly acted in a way that was not well thought out, and understood that sending threats was wrong, I do not believe he ever had any intent to harm anyone or fully appreciated the seriousness of his actions or their impact. I believe his cognitive limitations, impaired judgment, and emotional distress brought him to these actions. These are issues that we have addressed constructively in ongoing therapy.

Ex. I.E. (Dr. Inz letter) at 3.

These conclusions were not conjured as an excuse in the wake of Daniel's arrest. Rather, they are consistent with voluminous records dating back to Daniel's childhood. Throughout his life, professionals who have worked with Daniel recognized that while he appears to exhibit "strengths in verbal comprehension, humor, and communication . . . these skills can be misleading as Daniel has trouble anticipating consequences and therefore is at risk for making poor decisions." Ex. I.K. (2008 school evaluation by Kathryn Drinkwater, referenced in PSR ¶ 100). "He does not develop the relationships between units of information that will allow him to readily retrieve, apply or contextualize that material (including emotions and social interactions)." *Id*.

Since his arrest, Daniel has been fully compliant with his release conditions and has constructively addressed the issues that gave rise to the offense conduct with his therapist, Dr. Inz, his family, and his broader support network. Dr. Reade explained:

> Now that the behavior has come to light, Daniel's parents and therapist have taken the steps necessary to deal with the underlying problem—his unresolved distress over his persistent limitations—and to help Daniel express himself in constructive ways. This, in my view, is important on several levels. It means that Daniel is getting the help he needs to deal with his inner distress effectively, and that means he is unlikely to act out in the future in a fashion that is harmful to others.
>
> Daniel is deeply remorseful for his behavior and appalled that anyone might have been harmed by his actions. He is worried that he is the reason Donald, Jr. is getting a divorce, worried that the powder he sent might have injured the unborn child belonging to Senator Stabenow's aide, and expects that that child will one day come after him for retribution, which he feels he deserves.

> He is also clear that he would never attempt anything similar in the future. He is chastened by his time in jail and horrified by the consequences of his ill-considered actions. He has been fully compliant with all of the terms of his release and is motivated to do whatever he has to do to avoid returning to jail. Daniel's respect for rules makes him likely to continue to comply with any restrictions going forward.

Ex. I.A. (Dr. Reade letter) at 30.

## Argument

We submit that in the circumstances of this case, the proposed sentence of five years probation, with the first year in home confinement, restitution, and community service, is "sufficient but not greater than necessary, to comply with the purposes of sentencing." 18 U.S.C. § 3553(a).

In the wake of *United States v. Booker*, 543 U.S. 220 (2005), the Sentencing Guidelines are advisory, not mandatory. Nevertheless, the Court is required to compute the Guideline Sentencing Range ("GSR") as a "starting point and the initial benchmark." *Gall v. United States,* 128 S.Ct. 586, 596 (2007). Here, Probation and the parties agree that the correctly-calculated GSR is 51-63 months (level 24, CHC I).

However, the Guidelines are not the sole, nor even the first among the factors that Congress has commanded the courts to apply in section 3553(a). The Court "may not presume that the Guidelines range is reasonable" and must "make an individualized assessment based on the facts presented." *Id*. at 596-7. Indeed, "the Guidelines are only one of the factors to consider . . . and 3553(a) directs the judge to consider sentences other than imprisonment." *Id*. at 602 (emphasis added). The Supreme Court later emphasized again that the "Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 129 S.Ct. 890, 892 (2009) (emphasis in original).

Thus, district courts are now permitted, indeed, directed to consider whether the advisory guidelines would result in a sentence of imprisonment that is unreasonably high or ignore viable alternatives to incarceration. *See United States v. Kimbrough*, 128 S.Ct. 558, 575 (2007); *United States v. Boardman*, 528 F.3d 86 (1st Cir. 2008); *United States v. Martin*, 520 F.3d 87, 93-94 (1st Cir. 1998).

The First Circuit elaborated on the meaning and breadth of the so-called parsimony principle in *United States v. Yonathan Rodriguez*, 527 F.3d 221 (1st Cir. 2008). In *Rodriguez*, the First Circuit stressed that the Supreme Court ruling in *Kimbrough* requires a "more holistic inquiry" and that "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle." *Id*. at 228. That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id*. In reaching a decision on what constitutes an appropriate sentence, the district court should "consider all the relevant factors" and "construct a sentence that is <u>minimally sufficient</u> to achieve the broad goals of sentencing." *Id*. (emphasis added).

### A. The Proposed Sentence Will Provide Just Punishment.

The proposed sentence represents a substantial penalty that "reflect[s] the seriousness of the offense[s]" of conviction, "promote[s] respect for the law," and "provide[s] just punishment" as required by section 3553(a)(2)(A). It accounts for Daniel's diminished capacity, acknowledges the unique harm that prison would inflict on Daniel and the dangers he would face there, and yet still imposes very substantial punishment.

#### 1. Daniel's Diminished Capacity Mitigates His Culpability.

"Mentally retarded persons who meet the law's requirements for criminal responsibility should be tried and punished when they commit crimes." *Atkins v. Virginia*, 536 U.S. 304, 306

(2002). "Because of their disabilities in areas of reasoning, judgment, and control of their impulses, however, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct." *Id*. Indeed, even prior to *Booker*, the Guidelines recognized that mental and emotional conditions could warrant a downward departure. *See* U.S.S.G. §5H1.3.[1]

As described above, Daniel has an extensively documented history since birth of cognitive deficits and psychiatric disorders. After years of intervention and therapy, he can string together words to craft coherent adult sentences but still has the judgment and impulse control of a child and can be oblivious to the actual impact his words may have on others. His disabilities therefore provide important mitigating context to his offense conduct.

### 2. Imprisonment Would Subject Daniel to Acute Harm and Danger.

By letter to the prosecutor dated February 21, 2019, Dr. Tamara Lyn, Psychology Services Administrator at the BOP Central Office, addressed the BOP's ability to accommodate Daniel. In her letter, Dr. Lyn noted that "the BOP houses and treats a significant amount of inmates with a wide variety of mental illnesses and conditions." Ex. I.H. at 6. This statement is factually accurate. Nor do we dispute that "the BOP has policies and programs in place that are intended to provide a constitutionally adequate level of care for <u>any</u> medical or psychiatric condition." Ex. I.J. (Donson Supp. Aff.) at 1. But despite these good faith efforts, the BOP has a

---

[1] In addition, U.S.S.G. § 5K2.13 authorizes downward departure for "diminished capacity" unless "the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence." Since all federally prosecuted threats are inherently "serious," we submit that "serious threat of violence" should be interpreted to mean <u>credible</u> threat of violence. As discussed *infra*, Daniel never actually intended or was capable of committing actual violence, nor is there a need to protect the public from Daniel in the future. A "diminished capacity" departure therefore remains expressly available and applicable here. But even if such a departure were not technically available, the Court is not limited by the Guidelines in the post-*Booker* era.

well-documented history of "serious deficiencies in staffing and standards of medical and mental health care." *Id*. (citing, *inter alia*, reports by the DOJ Inspector General). Nor does Dr. Lyn's letter address concerns specific to Daniel raised by Dr. Reade (forensic evaluator), Dr. Inz (longtime therapist), and Mr. Donson (30-year correctional management veteran with over 20 years in BOP).

Daniel would suffer acute distress and psychological deterioration in a prison setting. Daniel's combination of autism and brain damage make his situation uniquely complex.

> Although he has been given a diagnosis of Autism Spectrum Disorder and an Anxiety Disorder, it is important to note that Mr. Frisiello's problems do not fall into neat categories and therefore often defy conventional management, even by clinicians with specialized training. He suffered severe brain injury related to oxygen deprivation at birth, and his many cognitive and behavioral limitations emanate from this brain damage. His limitations were best described as approximating those seen in an Autistic disorder—trouble with novelty, difficulty reading social cues, high levels of anxiety—but they are complicated by his brain damage, which affects his intellectual capacity. Mr. Frisiello functions at a cognitive level that used to be characterized as mental retardation.

Ex. I.I. (Dr. Reade letter) at 1. Dr. Reade identified multiple specific problems or risk factors: Daniel's inability to cope with the physical environment of a prison; disruptions of his medication regimen; and his vulnerability to exploitation, abuse, and isolation.

> [A] prison sentence of any duration would be disastrous for Daniel. His complex disabilities make him a target for exploitation by others and will interfere with his adjustment in any correctional setting. He is ill-equipped cognitively and emotionally to deal with the social, physical, or emotional challenges of prison. He will be extremely vulnerable in a general population to physical, sexual, and emotional abuse. If held in isolation, Daniel will be vulnerable to psychosis and acute psychological deterioration. Emotionally, he has very few coping skills. He is overwhelmed by noise, mildly paranoid when anxious, and unable to modulate those reactions without considerable outside support and medication. He deteriorated alarmingly during his short detention after his arrest, reporting auditory hallucinations, despair and paranoia. There is no way, in my view, to mitigate the trauma of prison for Daniel. Even on a hospital unit, he is likely to adjust poorly and deteriorate psychologically. Of particular concern, in any prison setting, Daniel will not have access to his anxiolytic medication, Klonopin, which he needs to maintain his psychological equilibrium.

Ex. I.A. (Reade evaluation) at 31. Dr. Inz concurred in this assessment:

> Daniel would not fare well in a prison environment. The ambient noise, limited interactions with family, and absence of normal environmental stimuli will cause him significant distress and undermine the years of work that have gone into helping Daniel to achieve a measure of stability and independence as a functional member of the community.

Ex.I.E. (Inz Letter) at 4.

With regard to the first specific risk factor, Daniel's inability to adapt to the physical environment, Mr. Donson detailed the sensory issues most problematic for Daniel — heightened sensitivity to noise, light, smell, and touch characteristic of Autism Spectrum Disorder — which contributed to Daniel's extreme difficulties at Wyatt:

> Secure federal prison living environments are often brightly lit for security reasons and, even at night, there is some light. In an FCI Low, the living conditions are usually a dorm-type setting with over 100 inmates housed in cubicle cells. There is almost constant noise and chatter that dominates such an open setting. It is also common to have strong food odors, as many inmates cook food they purchase in the commissary in microwaves. With regard to touching, correctional officers frequently pat search inmates throughout the facility on a daily basis given the security protocol.

Ex. I.C. (Donson Aff.) at 5.

The impact of overwhelming environmental stimuli in prison would be compounded by the second specific risk factor, likely disruptions in Daniel's medications. Daniel's pharmaceutical treatment regimen was developed over many years and is critical to manage his psychiatric conditions and maintain stable daily functioning. *See* Ex.I.F. (Dr. Prince letter). According to Mr. Donson, "BOP medical staff substitute medication at their discretion upon arrival based only on the information in the PSR and rarely have access to the detailed personal physician's chart, information and history of how and why a specific medication regimen was developed." Ex. I.C. (Donson Aff.) at 5. Three of Daniel's medications (Effexor, Trileptal, and

Melatonin) are not on the BOP formulary while access to Klonopin is severely restricted. *See id*. "While there is a process for requesting the approval of non-formulary medications . . . the requests not only take time but they are also often denied." *Id*. Any substitution for Klonopin would be especially problematic for Daniel because "there is no 'substantially similar equivalent' medication to treat his anxiety disorder." Ex. I.I. (Dr. Reade letter) at 2.

> During his brief detention at Wyatt Detention Facility after his arrest, Mr. Frisiello was denied Klonopin, and appeared to be overwhelmed with anxiety and acutely sweaty. It is likely, given his baseline dose of Klonopin and the abrupt cessation of the medication, that he was suffering acute physical withdrawal symptoms. This is a physically and psychologically uncomfortable experience that carries with it the risk of generalized seizures, and can persist long after the drug has cleared from the body. For many people with severe anxiety who have become tolerized to Klonopin, a full physiological withdrawal can take months.

*Id*.

Finally, addressing the third specific risk factor, Daniel "cannot reliably judge another person's intentions, behaviors, or communications. This makes him a target for exploitation by others." Ex. I.I. (Dr. Reade Letter) at 1. Mr. Donson elaborated, "Mr. Frisiello has been described as 'gullible' and 'vulnerable to predation.' FCI units ordinarily have a single unit correctional officer for approximately 150 inmates. It is very difficult to police predatory behaviors given this staffing limitation." Ex. I.C. (Donson Aff.) at 4. Failure to understand unwritten social rules "may be interpreted as rude or disrespectful by both staff and inmates. Disrespect in a secure prison environment can be detrimental regarding inmate peer relationships and can even result in assault by inmates and the issuance of incident reports by staff." *Id*. at 6. Daniel's processing delays create further risk that staff will erroneously view him as non-compliant. *Id*.

One common consequence of the foregoing dynamics is that prisoners with cognitive deficits and mental illness like Daniel often find themselves serving long portions of their

sentences in solitary confinement, either as a result of placement in protective custody or disciplinary segregation, in a "vicious cycle that repeats itself throughout the inmate's term." *Id.* at 4. Daniel "lacks the resources to manage the isolation. This means he is vulnerable to psychosis and psychological deterioration" if held in solitary confinement. Ex. I.I. (Dr. Reade Letter) at 1.

Even prior to *Booker*, downward departures from the then-mandatory Guidelines could be justified based on a defendant's likelihood of victimization in prison. *See, e.g., Koon v. United States*, 518 U.S. 81, 111 (1991) (finding that district court had discretion to depart downward based on police officers' high "susceptibility to abuse in prison."); *United States v. Gonzalez*, 945 F.2d 525, 527 (2d Cir. 1991) (recognizing departure warranted where "prison conditions may be particularly oppressive to vulnerable individuals"); *United States v. Lara*, 905 F.2d 59, 601 (2d Cir. 1990) (departing based on defendant's "potential for victimization in prison"). Likewise, courts have always enjoyed discretion to depart based on the BOP's inability to provide adequate treatment for medical or psychiatric conditions. *See, e.g., United States v. Martin*, 363 F.3d 25 (1st Cir. 2004) (affirming departure where BOP could not assure adequate treatment for Crohn's disease); *United States v. Gee*, 226 F.3d 885, 902 (7th Cir. 2000) (affirming departure where government's only evidence that BOP could adequately treat defendant's medical condition was a "form letter trumpeting the BOP's ability to handle medical conditions of all kinds.").

In the post-*Booker* area, undersigned counsel is aware of at least one court in this district that imposed a probationary sentence based on concerns about how the BOP would handle the defendant's medical and mental health conditions. *See United States v. Nicholas Gregory Jr.*, No. 12-cr-10196-GAO. The defendant faced a Guideline range of 57-71 months on a conviction

for money laundering conspiracy in connection with marijuana trafficking. *See* DE 490 at 7 (judgment dated 6/11/15). The BOP provided written documentation that it could accommodate the defendant's medical and mental health conditions, even answering very specific questions that Judge O'Toole had posed. *See* DE 471-1 (letter from BOP Regional Medical Director to prosecutor dated 4/16/15). Nevertheless, Judge O'Toole imposed a sentence of 36 months probation with the first year in home confinement. *See* DE 490. Judge O'Toole explained:

> [O]ne of the consequences of the now, I guess, decade-old Supreme Court decision regarding the advisory nature of the Guidelines is that it gives us some greater flexibility to model sentences that perhaps more appropriately and on a particularized basis accommodate the varying sentencing considerations that are set forth in 3553(a).
>
> There's no question that the nature and the circumstances of the offense are very serious and generally will call for some — even for a first offense for some incarceration. I am persuaded, though, in this case, that we can develop a different punishment, which will be punishment, that takes account of Mr. Gregory's physical issues and, as well, tries to minimize collateral harm to others that may come from the sentence.

*Id*. at 11 (transcript excerpt appended to judgment).

### 3. The Proposed Sentence is Sufficiently Punitive.

While it is easy to become inured to enormous sentences in the federal system, and to expect some incarceration in nearly every case, a federal felony conviction resulting in a lengthy term of probation with home confinement is a substantial penalty, particularly for an offense that did not involve actual physical violence by an individual with no criminal history whatsoever. Daniel has endured humiliation and stress — including 12 excruciating days in pretrial detention at Wyatt — he scarcely could have imagined before. He already has spent more than a year in highly restrictive home confinement and would serve another year under the proposed sentence.

The Supreme Court noted in *Gall v. United States*, 128 S.Ct. 586 (2007), that probation

supervision — even without home detention — amounts to a "substantial restriction of freedom." 158 S. Ct.. at 595. As the court observed in one of the first sentencing hearings conducted in this district after *Gall*:

> *Gall* recognized for the very first time in a very long time that probation is not nothing, that there are substantial restrictions on an individual's freedom in probation, that we can structure a probationary sentence that meets all the purposes of sentencing, and that is entirely appropriate. This was one of the things that the guidelines ignored, and the guidelines dramatically changed from preguideline practice and which the Supreme Court is essentially saying we can now look at again.

*United States v. Ramos*, No. 04-cr-10275 (D. Mass. 2008) (excerpt of sentencing transcript filed with Judgment, DE 62) (ordering probationary sentence for substantial oxycontin trafficking where GSR was 37-46 months).

Courts also have recognized that myriad severe collateral consequences attach to a federal felony conviction, which can amount to a kind of "civil death." *United States v. Nesbeth*, 188 F. Supp. 3d 179, 181 (E.D.N.Y. 2016) (lengthy decision detailing collateral consequences of conviction in imposing non-incarceration sentence). These consequences will weigh even more heavily on Daniel, who already faces "limited options in the world" (*e.g.*, employment, housing, etc.), as Dr. Reade put it, "because of his complex cognitive and social deficits." Ex. I.A. at 31.

Finally, the Sentencing Reform Act, which created the Guidelines, called for courts to consider probationary penalties as a distinct type of sentence with independent value, not merely a "lenient" option to be used only in the most extraordinary cases. Congress directed the Sentencing Commission to "promulgate . . . guidelines . . for use of a sentencing court in determining the sentence to be imposed in a criminal case, including . . . a determination <u>whether</u> to impose a sentence to probation, a fine, or a term of imprisonment." 28 U.S.C. § 994(a)(1)(A)

(emphasis added). Congress further directed sentencing judges, "in determining <u>whether</u> to impose a term of imprisonment," to "consider the factors set forth in section 3553(a)." 18 U.S.C. § 3582(a) (emphasis added). Thus, Congress intended the courts to first determine <u>whether</u> to imprison, considering probation as one of the "kinds of sentences available." 18 U.S.C. § 3553(a). Yet despite these clear directives, the Guidelines offer no option that does not include a term of imprisonment; no combination of offense level and criminal history category excludes the possibility of imprisonment. By contrast, the (now advisory) sentencing table excludes probation as an option in many cases. As a result, the percentage of federal defendants sentenced to a purely probationary sentence declined from approximately 48% in 1984 to 6.2% by 2007.[2] Rather than providing courts with a range of prison and non-prison alternatives as Congress had intended, the Commission instead inexplicably dismissed probation as a "very lenient" punishment that rarely would be used.

Post-*Booker*, this Court is required to consider <u>all</u> of "the kinds of sentences available" by statute, 18 U.S.C. § 3553(a)(3), even if the "kinds of sentence . . . established [by] the guidelines" zones recommend only a prison term. *See Gall*, 552 U.S. at 59 & n.11. Daniel is statutorily eligible for probation because each count is a class C or D felony. *See* PSR ¶ 130 (citing 18 U.S.C. § 3561(c)(1)). Even without a term of incarceration, nobody looking at what Daniel has already experienced and the consequences he will face in the future could mistakenly conclude that his crimes are anything other than extremely serious.

---

[2] U.S. Sentencing Commission, 2 *The Federal Sentencing Guidelines: A Report on the Operation of the Guidelines System and Short-Term Impacts on Disparity in Sentencing*, Use of Incarceration, and Prosecutorial Discretion and Plea Bargaining 376 fig. 14 (1991); U.S. Sentencing Commission, 2007 *Sourcebook to Federal Sentencing Statistics* 27 fig. D. (2007).

### B. The Proposed Sentence Will Provide Sufficient Specific and General Deterrence.

The proposed sentence will be more than sufficient to deter Daniel from similar crimes in the future and to provide general deterrence, as required by sections 3553(a)(2)(B) and (C).

#### 1. Specific Deterrence

While Daniel's disabilities and a confluence of life circumstances contributed to the offense conduct, that "blind spot" has now been addressed. The wrongfulness of Daniel's actions is no longer just an abstraction to him — he has experienced very visceral, harsh punitive consequences and also has developed a more concrete and empathetic understanding of how others received his words and actions. He has been scrupulously compliant with his conditions of release. And a sentence of five years probation maximizes deterrence because any violation during the years of supervision in the community would subject Daniel to the full maximum statutory penalties — up to 10 years — for the underlying crimes of conviction.

> More concretely, Dr. Reade made the following risk assessment in her evaluation:
>
> [A]ll risk assessments necessarily occur along a spectrum and are approximations. There is no zero risk. Based on actuarial measures — including prior history of violence, arrest record, weapons training, weapons ownership, character pathology, age, gender, substance abuse history, mental illness, Daniel's risk of violence is extremely low. Looking at clinical variables — like presence of psychiatric symptoms, current use/abuse of substances, character traits/structure, I would rate Daniel's risk of violence as extremely low. He is not a sociopath and wishes to do good for the world. It is important, in my opinion, that Daniel has taken full responsibility for his problematic behavior and acknowledges the harm he caused. This indicates a sense of agency and accountability which adds to his excellent prognosis.
>
> Daniel's incendiary language in his letters makes him sound more capable than I believe he really is. He has little understanding that his words have impact on others and expects to be routinely dismissed or mocked. He lacks the organizational skills and underlying aggression to carry out a physical attack on someone.
> . . .
> Daniel's arrest and short detention have had a significant deterrent effect on him. He is motivated to avoid a return to a correctional setting, and has been

> completely compliant with his current restrictions. Daniel is also motivated to stay out of trouble. He has an intact moral compass and no wish to harm others. He is likely, in my view, to be amenable to supervision in the community. His risk of recidivism is very low.

Exhibit I.A. at 28. Dr. Inz, Daniel's longtime therapist, concurred:

> Overall, I feel that Daniel has responded extremely well to the psychotherapy. He has been very consistent in his attendance, never missing a single session. Daniel has been earnest in his efforts to learn from the difficult experience he has been through — recognizing his own responsibility for his predicament — and seems to be better for it. Daniel realizes he was wrong and committed serious crimes and I have no concern he will ever commit such crimes again.

Exhibit I.E. at 5. In short, the Court has every reason to be confident that Daniel poses little risk of recidivism and no reason to conclude that further incarceration is <u>necessary</u> to accomplish deterrence.

### 2. General Deterrence

As noted above, the proposed sentence is appropriately severe and should be viewed as such by the broader public. Moreover, the very fact of apprehension and federal prosecution will serve the interest in general deterrence. There are no data to suggest that a more severe sentence would have any marginally greater general deterrent effect. Indeed, research consistently has shown that "increases in the severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id*. *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm*, 8 CARDOZO J. CONFLICT RESOL. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity."). On the other hand, there is a substantial body of research that suggests "crime-reducing aspects of imprisonment are considerably negated by crime-enhancing ones." Todd Clear, *Backfire: When*

*Incarceration Increase Crime, The Unintended Consequences of Incarceration.* (Vera Inst. 1996).

### C. The Proposed Sentence Will Provide Necessary Treatment that BOP Cannot.

Section 3553(a)(2)(D) directs the Court to craft a sentence that will "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment <u>in the most effective manner</u>" (emphasis added). The record leaves no doubt that a sentence of imprisonment is far from the "most effective" way to ensure continuity of effective treatment for Daniel.

Indeed, as discussed above, BOP would be challenged even to maintain Daniel's psychiatric stability and physical safety, much less provide any affirmative therapeutic benefit. The only potentially applicable "treatment" identified by BOP in Dr. Lyn's letter is the "Skills" program, which is designed to "increase the academic achievement and adaptive behavior of cognitively impaired inmates" and is only available at FCI Danbury and FCI Coleman. *See* Ex. I.H. at 5. But as Dr. Reade explained:

> With respect to the . . . options available in the Bureau of Prisons outlined by Dr. Lyn, none of these would be fully responsive to Mr. Frisiello's particular needs. The "Skills" program offers support and skill-building appropriate to his cognitive abilities, but is not designed for someone with Mr. Frisiello's psychological complexity. It is unlikely to provide him with the coordinated psychiatric/psychological care he needs and is currently receiving in the community. Mr. Frisiello's current treatment is specifically tailored to his particular, idiosyncratic admixture of problems, and is overseen by clinicians who have specific expertise and training, as well as a long and deep familiarity with Mr. Frisiello and his family.

Ex. I.I (Dr. Reade letter) at 2. Likewise, Mr. Donson stated:

> Mr. Frisiello is compliant with his current supervision requirements and his community treatment plan. He is participating in counseling that addresses his cognitive deficits and mental illness. Such individual treatment cannot be duplicated in a secure correctional setting given the staffing and overall government resource constraints. There are limited programming opportunities

> for inmates in BOP and it is unreasonable to assume the agency can replicate the personalized treatment that Mr. Frisiello is currently receiving with the support of his community, professional treatment providers, and family members. In my professional opinion, the progress he has made since arrest will be quickly erased in any prison environment and he could suffer long term detrimental effects from the interruption of both treatment and medication.

Ex. I.C. (Donson Affidavit) at 7. With regard to the Skills program, specifically, Mr. Donson noted:

> BOP may conclude that the institutions with Skills programs are not medically suitable. Moreover, while the Skills program could potentially provide Mr. Frisiello with a somewhat more appropriate environment (these inmates live in a separate unit but still interact with the general population) it is doubtful that it would provide substantial therapeutic benefit because Mr. Frisiello has essentially lived his entire life in web of adaptive and therapeutic services far more individualized and intensive than what any correctional program could offer.

Ex. I.J. (Donson Supp. Aff.) at 3.

Finally, the Sentencing Commission staff has recognized that, even for ordinary defendants who do not struggle with Daniel's array of disabilities, non-incarcerative sentences "divert offenders from the criminogenic effects of imprisonment which include contact with more serious offenders, disruption of legal employment, and weakening of family ties." U.S. Sentencing Commission, Staff Discussion Paper, Sentencing Options Under the Guidelines 19 (Nov. 1996).

## Conclusion

For the foregoing reasons, we respectfully submit that the proposed sentence of five years probation, with the first year in home confinement, accompanied by restitution and community service, is a sufficient and appropriate sentence in this case.

Respectfully submitted,

DANIEL FRISIELLO
by his attorney

*/s/ William Fick*
WILLIAM W. FICK, ESQ. (BBO # 650562)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
WFICK@FICKMARX.COM

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 17, 2019.

*/s/ William Fick*